**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ALLIE LITTERER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **UNITED STATES; CITY OF** ) | |
| **CHICAGO; AMERICAN AIRLINES** ) | |
| **INC.; ENVOY AIR, INC.;** ) | |
| **and UNITED MAINTENANCE** ) | |
| **SERVICES, INC.,** ) | |
| ) | **Case No. 19 C 5172** |
| **Defendants.** ) | |
| ----------------------------------------------------- | |
| **CITY OF CHICAGO,** ) | |
| ) | |
| **Cross-Claimant,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **UNITED MAINTENANCE SERVICES,** ) | |
| **INC.,** ) | |
| ) | |
| **Cross-Respondent.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

After Allie Litterer slipped and fell at an airport security checkpoint, she filed suit against the United States, the City of Chicago, American Airlines, Inc., Envoy Air, Inc., and United Maintenance Services, Inc. She alleged, in part, that her injuries were the result of those defendants' negligence. Of the ten counts and four defendants in Litterer's second amended complaint, only two counts involving one defendant remain: Counts 1 and 2, which allege negligence on the part of the United States.

Though Litterer withdrew her allegations against the City, it remains in the case as a cross-claimant. It has sued UMS, alleging that it breached its contract with the City by failing to defend the City from Litterer's suit and failing to procure insurance that named the City as an additional insured. Following Litterer's dismissal of her claims against the City and UMS, the Court decided to retain supplemental jurisdiction over the City's crossclaim under 28 U.S.C. § 1367(c), largely due to the advanced stage of the litigation at that point. Both the City and UMS have moved for summary judgment on the City's claims.

## Background[1]

UMS is a custodial services company. In 2012, the City and UMS entered into an agreement that made UMS responsible for providing comprehensive custodial/window cleaning and related hygiene and disposal services at Chicago O'Hare International Airport. These services were to be provided round-the-clock and on every day of the year. Among the areas for which UMS had responsibility were Transportation Safety Administration (TSA) checkpoints in O'Hare's Terminal 3. The agreement between the City and UMS also required UMS to obtain commercial general liability insurance for "all premises and operations." Ex. J (Dkt. no 136-2 at ECF p. 81 of 358). The agreement further required that "the City . . . be named as an additional insured on a primary, non-contributory basis for any liability arising directly or indirectly from the work." *Id.*

---

[1] Because summary judgment is only "appropriate when the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," except where otherwise noted, the facts in this section are not in dispute. *See Barnes v. City of Centralia*, 943 F.3d 826, 830 (7th Cir. 2019) (internal quotation marks omitted).

On the day of Litterer's accident, UMS was responsible for custodial services and its agreement with the City was in effect.  Litterer was a ticketed passenger for an American Airlines flight that was to depart out of O'Hare.  On her way to her gate, Litterer entered a TSA checkpoint in Terminal 3.  Rather than walk through a full-body scanner, she opted for a pat-down; upon her request, a TSA officer directed her to another section of the checkpoint.  After Litterer picked up her carry-on items and began walking in the direction the officer pointed at, she slipped and fell.  She was assisted by several bystanders.  All of this—as well as the moments before Litterer's arrival and the moments after her fall—was captured by an airport surveillance camera.

It is undisputed that a puddle of liquid caused Litterer's fall.  UMS contends that one of the surveillance videos establishes that a child dropped a bottle of liquid and spilled its contents about four minutes before the fall.  That said, it is uncontested that the video does not show liquid on the floor.  After the accident, the City says TSA called UMS to clean up the spill; UMS contests this.  The parties agree that a TSA employee helped clean the spill that caused Litterer's fall.  But they dispute whether a UMS employee also helped clean the spill.

At the relevant time, UMS was responsible to keep, inspect, clean, and remove liquid from the floors near TSA checkpoints, round-the-clock.  However, its ability to perform custodial and maintenance work inside checkpoints was impacted by the operational status of the checkpoints.  Generally, UMS's daily cleaning activities did not include routine cleaning of checkpoint floors while checkpoints were in operation.  Instead, when a checkpoint was operational, TSA was in control and handled custodial and maintenance duties on its own.  If, however, there were a maintenance or custodial

concern during a checkpoint's operating hours—a spill for example—TSA could call UMS, and UMS would respond.

Litterer filed her suit in Illinois state court in 2018. She named the City as a defendant but not UMS. In early 2019, the City issued a tender of defense to UMS and attached the complaint along with portions of UMS's agreement with the City. UMS forwarded the City's tender to its insurer. The parties contest UMS's response to the tender; the City says UMS has never responded, but UMS says that it denied it owed the City either a defense or indemnity. Litterer voluntarily dismissed her state court suit in October 2019 and filed this suit in December 2019. She included UMS among the defendants.

After Litterer filed this suit, the City cross-claimed against UMS. Count 1 of the City's crossclaim is based on UMS's alleged breach of the duty to defend and Count 2 is premised on its alleged breach of its contractual duty to provide insurance.

### Discussion

When courts consider cross-motions for summary judgment, the "ordinary standards" remain in effect. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Est. of Suskovich v. Anthem Health Plans Of Virginia, Inc.*, 553 F.3d 559, 563 (7th Cir. 2009) (internal quotation marks omitted).

"It is axiomatic that the first step in the summary-judgment process is to ask whether the evidentiary record establishes a genuine issue of material fact for trial."

*James v. Hale*, 959 F.3d 307, 310 (7th Cir. 2020). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). A genuine dispute regarding a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In weighing a motion for summary judgment, courts must view the facts "in the light most favorable to the nonmoving party" but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Generally, the party seeking summary judgment bears the initial responsibility of proving there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and then the nonmoving party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255. To determine what is disputed, the Court must focus "not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements." *Thompson v. Vill. of Monee*, 110 F. Supp. 3d 826, 833 n.3 (N.D. Ill. 2015). "When we cite as undisputed a statement of fact that a party has attempted to dispute that reflects our determination that the evidence does not show that the fact is in genuine dispute." *Id.* (internal quotation marks omitted).

If there are no genuine issues of material fact, the court then determines whether the moving party is entitled to judgment as a matter of law. *See Barnes*, 943 F.3d at 830. When a court determines that no material fact is in dispute and that the moving party is entitled to judgment as a matter of law, it has in effect concluded that "no reasonable jury could find for the [non-moving] party based on the evidence in the record." *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018)

(internal quotation marks omitted).

Both the City's claims are premised on breach of contract. In Illinois, a plaintiff claiming breach of contract must establish: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *See Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (internal quotation marks omitted).

## A.    Duty to procure insurance

First up is the Court's consideration of UMS's duty to procure insurance. The City argues that UMS has breached the agreement between the parties because it failed to secure a policy that named the City as an additional insured. UMS asserts that it obtained the insurance required by the agreement.

When a party agrees to obtain insurance, its obligation is "discharged simply by procuring and paying for the insurance." *Medline Indus., Inc. v. Ram Med., Inc.*, 892 F. Supp. 2d 957, 967 (N.D. Ill. 2012). "Thus, under an agreement to obtain insurance, the promisor bears no responsibility in the event of an injury or damages once the insurance is obtained." *Sears, Roebuck & Co. v. Charwil Assocs. Ltd. P'ship*, 371 Ill. App. 3d 1071, 1078, 864 N.E.2d 869, 875 (2007).

Contracts to procure insurance are analyzed under the general principles of contract law. *Medline Indus.*, 892 F. Supp. 2d at 969. "When interpreting the provisions of a contract, the court must ascertain and give effect to the intent of the parties." *Equistar Chemicals, LP v. Liberty Mut. Fire Ins.*, No. 07 C 1860, 2009 WL 10694232, at *7 (N.D. Ill. Apr. 23, 2009) (internal quotation marks omitted). The language of the parties' contract is the best indication of their intent. *Id.* (internal quotation marks

omitted). In reading the provisions, courts must not "view a clause or provision in isolation" but instead must "construe the contract as a whole, viewing each provision in light of the other provisions." *Westfield Ins. Co. v. Keeley Constr., Inc.*, 2020 IL App (1st) 191876, ¶ 21. The parties' disagreement "regarding the interpretation of a particular provision does not render that provision ambiguous." *Liberty Mut. Fire Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 363 Ill. App. 3d 335, 341, 842 N.E.2d 170, 175–76 (2005).

The Court's analysis begins with the plain language of the parties' agreement. Article 3.4 ("Contractor's Insurance"), section (A) ("Insurance to be Provided"), subsection (2) (Commercial General Liability (Primary and Umbrella)) of the agreement states that UMS must "provide and maintain":

> Commercial General Liability Insurance or equivalent with limits of not less than $10.000,000 per occurrence for bodily injury, personal injury, and property damage liability. Coverages must include the following: All premises and operations, products/completed operations (for a minimum of two (2) years following project completion), explosion, collapse, underground, separation of insureds, defense, and contractual liability (with no limitation endorsement). The City of Chicago is to be named as an additional insured on a primary, non-contributory basis for any liability arising directly or indirectly from the work.
>
> Subcontractors performing work for the Contractor must maintain limits of not less than $5,000,000 for access to airside and $2,000.000 for landside with the same terms herein.

Ex. J (Dkt. no 136-2 at ECF pp. 80–81 of 358) (emphasis omitted).

The language of this provision plainly required UMS to: (1) obtain "Commercial General Liability Insurance or [the] equivalent . . . for bodily injury, personal injury, and property damage"; and (2) name the City "as an additional insured on a primary, non-contributory basis for any liability arising directly or indirectly from [UMS's] work." *Id.*

Neither party disputes this.

The disputed issue is whether UMS met its obligation under the agreement. At points in this litigation, UMS has contended it fulfilled its obligation via a certificate of insurability that included the City among the additionally insured. *See, e.g.,* Ex. C (Dkt. no 136-1 at ECF pp. 101–02 of 405) ("[W]e have a certificates of insurance which name the City of Chicago and the Department of Aviation as additionally insured bound by Zurich."). But UMS has seemingly changed tactics. Now, and for the first time, UMS contends that an endorsement in its commercial general liability insurance policy meets its contractual requirement to insure the City. Under the heading "Additional Insured - Designated Person or Organization," an endorsement "modifies" UMS's commercial general liability insurance policy so that:

> Any person or organization [that UMS is] required to add as an additional Insured on this policy under a contract or agreement shall be an Insured, but only with respect to that person's or organization's liability arising out of [UMS's] operations as a "Staffing Service" or premises owned by or rented to [UMS].

Ex. R (Dkt. no 136-3 at ECF p. 172 of 273).

Under "Section V - Definitions," the policy explains that "staffing services" are:

c.  . . . services provided by a staffing company to their clients including but not limited to . . .

> (6) Services performed on behalf of your client by a "staffing services worker" who is not a direct hire or permanent placement . . .

d. "Staffing services worker" means a person who is furnished by you to your client to perform the duties to which you have agreed.

*Id.* at ECF pp. 189–90 of 273. According to UMS, its agreement with the City was for staffing services, as it furnished staffing services workers to the City to perform services on behalf of the City. Vicki Rosen-Sanetra—UMS's chief operating officer and vice

president for operations—affirms that information in an affidavit. *See* Ex. BB (Dkt. no 141-1 at ECF pp. 37–39 of 224).

Before considering the sufficiency of the endorsement, the Court considers a threshold issue the City has raised. In the Federal Rule of Civil Procedure 30(b)(6) deposition of UMS, when asked if "an endorsement specifically names the City of Chicago," Rosen-Sanetra—UMS's Rule 30(b)(6) designee—said "[i]n the 70-page document, no." Ex. C (Dkt. no 136-1 at ECF pp. 103–04 of 405). According to the City, UMS is bound by this testimony and may not use Rosen-Sanetra's later affidavit to contradict her earlier testimony as a Rule 30(b)(6) designee. *See Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000) (holding that a corporate representative's earlier admission could not be contradicted by later testimony from another witness in order to defeat summary judgment, absent "a reasonable explanation" for the change in position) , *aff'd*, 31 F. App'x 151 (5th Cir. 2001).

UMS misunderstands how Rule 30(b)(6) binds a party. A corporate party is not unconditionally bound to its deposition designee's recollection. *See A.I. Credit Corp. v. Legion Ins. Co.,* 265 F.3d 630, 637 (7th Cir. 2001), *as amended on denial of reh'g* (Nov. 26, 2001). It is true that that an entity's Rule 30(b)(6) deposition testimony is "binding in the sense that whatever its deponent says can be used against the organization." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) (internal quotation marks omitted). But Rule 30(b)(6) testimony is not "binding in the sense that it precludes the deponent from correcting, explaining, or supplementing its statements." *Id.*

In fact, testimony given pursuant to Rule 30(b)(6) is "merely an evidentiary admission," and it does not have "conclusive effect." *Vehicle Mkt. Rsch., Inc. v. Mitchell*

*Int'l, Inc.,* 839 F.3d 1251, 1260 (10th Cir. 2016); *see also A.I. Credit Corp.*, 265 F.3d at

637 (stating "testimony of Rule 30(b)(6) designee does not bind corporation in sense of

judicial admission") (citing *United States v. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C.),

*aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996)).  Thus, "testimony given at a Rule 30(b)(6)

deposition is evidence which, like any other deposition testimony, can be contradicted

and used for impeachment purposes."  *A.I. Credit Corp*, 265 F.3d at 637 (internal

quotation marks omitted) (quoting *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 92 F. Supp.

2d 786, 791 (N.D. Ill. 2000)).  In sum, Rule 30(b)(6) does not bind UMS to its designee's

earlier statements.

Of course, there are other remedies available to correct perceived abuses in

deposition process.  In particular, the so-called "sham-affidavit rule" prevents a party

from submitting an affidavit that contradicts prior deposition testimony in order to defeat

a motion for summary judgment.  *James*, 959 F.3d at 315.  But that remedy is not

available here.  The City contends that Rosen-Sanetra has contradicted her response to

the question of whether the policy includes an endorsement that specifically named the

City of Chicago.  But Rosen-Sanetra does not say otherwise in her affidavit; in other

words, she does not contend that there is an endorsement that specifically names the

City.  Instead, she states facts necessary to conclude that the City would be covered

under the "Additional Insured - Designated Person or Organization" endorsement—not

because it is named, but because that endorsement, by its terms, includes as an

insured others that UMS was required to add as an additional insured, which in this

situation includes the City.  *See generally* Exhibit BB (Dkt. no 141-1 at ECF pp. 37–39

of 224).  That is not a contradiction of her earlier deposition.  Nor does her affidavit

implicate the concerns the sham-affidavit rule was intended to address. *See James*, 959 F.3d at 316 ("The organizing principle of our sham-affidavit practice is simply stated: a *genuine* issue of material fact cannot be conjured out of nothing. We adopted the sham-affidavit rule 'to weed out unfounded claims, specious denials, and sham defenses.'").

Turning to the merits, UMS contends that the language of the endorsement is coterminous with its obligation under the agreement. Put differently, UMS asserts that carrying coverage for "liability arising out of [UMS's] operations as a 'Staffing Service,'" Ex. R (Dkt. no 136-3 at ECF p. 172 out of 273), constitutes insuring the City for "any liability arising directly or indirectly from [UMS's] work." Ex. J (Dkt. no 136-2 at ECF p. 81 out of 358). The City disagrees; it says the language of the endorsement is not compliant with the agreement because the endorsement's language is limited to acts "arising out of UMS's operations." City Reply Br. at 6.

The Court agrees with UMS. "Arising out of means originating from, having its origin in, growing out of, and flowing from." *G.M. Sign, Inc. v. State Farm Fire & Cas. Co.*, 2014 IL App (2d) 130593, ¶ 28, 18 N.E.3d 70, 78, *as modified on denial of reh'g* (Sept. 2, 2014) (internal quotation marks omitted). That definition is capacious enough to include both direct and indirect liability that is the result of UMS's actions.

What's left to consider is whether the City and UMS have an agreement for staffing services as the UMS insurance policy defines that term because the endorsement only applies to the extent that the additional insured's liability arises out of UMS's operations as a "Staffing Service." *See* Ex. R (Dkt. no 136-3 at ECF p. 172 of 273). Rosen-Sanetra states in her affidavit that UMS "furnished its workers . . . to

perform the duties" in the agreement. *See* Ex. BB (Dkt. no 141-1 at ECF p. 39 of 224). The City responds that this cannot be true because the parties signed a "custodial agreement" rather than "an agreement to provide workers to the City." City Reply Br. at 6. To support this, the City notes that by the terms of their agreement, UMS managed its own staff on site and that the agreement included responsibilities unrelated to staffing like providing "equipment, supplies, and deliverables." *Id.* (citing Ex. J (Dkt. no 136-2 at ECF p. 47 of 358)).

The City's arguments hinge on an extratextual reading of UMS's insurance policy. First, the policy's definition of "staffing services" does not require that the client (the City) manage the staffing services workers. Instead, it is enough that the workers are furnished to the client. *See* Ex. R (Dkt. no 136-3 at ECF pp. 172, 189 of 273). The plain meaning of "furnish" is "to provide what is needed"; "supply, give." *Furnish*, Merriam-Webster's Dictionary, https://www.merriam webster.com/dictionary/ furnish (last visited June 22, 2021). Second, the policy provision does not require the underlying agreement be for staffing services only. Rather, the policy says any person or organization that UMS is required to add as an additional insured under a contract or agreement will be insured, but only to the extent that person's or organization's liability arises out of UMS's operations as a "staffing service." Ex. R (Dkt. no 136-3 at ECF pp. 172, 189 of 273). Thus, the only question here is whether UMS provided to the City persons—neither direct hires nor permanent placements—who performed UMS's duties under the agreement. *See id.*

Resolving the facts and inferences in the City's favor—as the party against which UMS's motion was made—any reasonable factfinder would be required to conclude that

UMS operated as a staffing service at O'Hare. *See Blow*, 855 F.3d at 797 ("[W]e construe all facts and inferences arising from [the cross-motion for summary judgment] in favor of the party against whom the motion under consideration is made."). UMS's employees were neither the City's direct hires nor permanent placements at O'Hare, and its employees were furnished to the City by UMS to perform UMS's duties under the agreement. *See* Ex. BB (Dkt. no 141-1 at ECF p. 39 out of 224). Though the City makes much of the fact that UMS managed its employees' on-site work, that fact is meaningless. UMS's insurance policy does not require that UMS's client manage or supervise UMS employees in order for UMS's operations to be considered a "staffing service." It is sufficient under the policy's clear language that UMS furnished its employees to the City and the employees performed UMS's duties under its agreement with the City. *See* Ex. R (Dkt. no 136-3 at ECF pp. 172, 189 of 273). In sum, because UMS's operations at O'Hare satisfy the prerequisites in the "Additional Insured - Designated Person or Organization" endorsement of its insurance policy, UMS met its obligation to procure insurance under its agreement with the City.

For the reasons discussed, the Court grants UMS's motion for summary judgment on Count 2—the City's claim regarding breach of the duty to procure insurance—and denies the City's motion for summary judgment on that claim.

**B.    Duty to defend**

Next, the Court considers the parties' arguments regarding the duty to defend. The City claims UMS has breached its duty to defend under the previously discussed insurance provision and under an indemnity provision within the same agreement. The Court discusses each of these provisions separately.

1.      **Duty to defend under insurance provision**

The City claims that UMS breached its duty to defend under the insurance procurement provision, which required the City to "be named as an additional insured on a primary, non-contributory basis for any liability arising directly or indirectly from the work." Ex. J (Dkt. no 136-2 at ECF p. 81 out of 358). The City's theory is that by failing comply with this provision, UMS deprived the City from receiving "the extremely broad obligation of the insurer to defend." City Reply Br. at 7.

But UMS is not an insurer, so the City's argument lacks merit. "[A]n agreement to obtain insurance is not an agreement of insurance and a person promising to obtain insurance does not by that promise become an insurer although he may assume the liabilities of one if he breaches the agreement." *FHP Tectonics Corp. v. NES Rentals Holdings, Inc.*, 2016 IL App (1st) 141650-U, ¶ 56 (internal quotation marks omitted).[2] And though a promisor may "assume the liabilities of an insurer," this is so only to the extent that the promiser is "liable for breach of contract and the corresponding payment of damages if he fails to procure the appropriate insurance." *Id.* ¶ 57 (internal quotation marks omitted).

In sum, the City may not claim that UMS had a standalone duty to defend under

---

[2] In its briefs, UMS objects to the City's citations to unpublished Illinois state court orders—like *FHP Tectonics Corp.*—and asks the Court to strike these references. *See* Ill. Sup. Ct. R. 23(e) ("An order . . . is not precedential except to support contentions of double jeopardy, res judicata, collateral estoppel, or law of the case."). The Court denies this request. Rule 23(e) only "bars parties from citing . . . unpublished decision[s] *as authority*" and does not "bar parties from using the reasoning and logic" from such decisions nor does it "prevent courts sitting in other jurisdictions from citing . . . unpublished orders in their dispositions." *Osman v. Ford Motor Co.*, 359 Ill. App. 3d 367, 374, 833 N.E.2d 1011, 1016–17 (2005); *Netherlands Ins. Co. v. Knight*, No. 4:10CV04043-SLD-JEH, 2014 WL 3376873, at *2 (C.D. Ill. July 10, 2014).

the insurance provision.

## 2.    Indemnity provision

The City also argues that UMS breached its duty to defend under the indemnity provision of their agreement.  The indemnity provision says that UMS:

> must defend, indemnify, keep and hold harmless the City, its officers, representatives, elected and appointed officials, agents and employees from and against any and all Losses, including those related to:
>
> > 1. injury, death or damage of or to any person or property . . . .
>
> "Losses" means, individually and collectively, liabilities of every kind, including losses, damages and reasonable costs, payments and expenses (such as, but not limited to, court costs and reasonable attorneys' fees and disbursements), claims, demands, actions, suits, proceedings, judgments or settlements, any or all of which in any way arise out of or relate to the acts or omissions of Contractor, its employees, agents and Subcontractors.

Ex. J (Dkt. no 136-2 at ECF p. 54 of 358).

Illinois courts have distinguished between an insurance company's obligation to indemnify its insured and a non-insurer's contractual obligation to indemnify the other contracting party.  Unlike insurance companies, which must defend a suit based on the allegations of a complaint, *see LaGrange Mem'l Hosp. v. St. Paul Ins. Co.*, 317 Ill. App. 3d 863, 869, 740 N.E.2d 21, 26 (2000), non-insurers are permitted to investigate the allegations in a complaint to determine whether to defend under a contractual indemnity provision.  *See Ervin v. Sears, Roebuck & Co.*, 127 Ill. App. 3d 982, 990, 469 N.E.2d 243, 249–50 (1984) ("Given the unique position of an insurance company as a professional 'seller' of protection against loss, and the fundamentally different role of the manufacturer of goods, we hold that it is not unreasonable to compel [an insurer] to defend the suit based on the allegations of [the insured's] complaint, while allowing [a party with a contractual obligation to indemnify another party] a greater degree of

freedom to investigate those allegations for the purpose of determining what its contractual obligations [were].").

Though the City acknowledges the holding in *Ervin*, it argues—without supporting citations—that the *Ervin* is now disfavored. Rather than apply *Ervin*, the City urges the Court to analyze UMS's duty to defend based solely on the allegations in Litterer's 2018 complaint, citing *McNiff v. Millard Maintenance Service Co.*, 303 Ill. App. 3d 1074, 715 N.E.2d 247 (1999), for support. In *McNiff*, the Illinois Appellate Court considered an indemnity provision included in a contract between two non-insurers, JMB Properties Urban Company and its janitorial service, Millard Maintenance Service Company. *Id.* at 1075, 715 N.E.2d at 248. At issue was whether the indemnity provision required Millard to indemnify JMB for the latter's own negligence. *Id.* When considering JMB's eligibility for reimbursement of its attorney's fees and costs under the provision, the court said that whether Millard's duty was "triggered depend[ed] solely upon the allegations in plaintiff's pleadings." *Id.* at 1081, 715 N.E.2d at 252.

*McNiff* would, in fact, seem to cast doubt on the applicability of *Ervin*. However, the Court declines to apply the standard in *McNiff* and will instead apply the one in *Ervin*. There are a few reasons for this. First, the court in *McNiff* did not mention or cite *Ervin*, so its choice of standard—explained in a single sentence—cannot really be considered as a repudiation of *Ervin*. *See id.* at 1081, 715 N.E.2d at 252. Second, since *McNiff*, the Illinois Appellate Court—recognizing the holding in *McNiff*—applied the *Ervin* standard when reviewing an indemnity provision in a contract between non-insurers. *See Dominick's Finer Foods, LLC v. Eurest Servs., Inc.*, 2015 IL App (1st) 150369-U, ¶¶ 33–44.

In *Dominick's Finer Foods*, the court adopted *Ervin*'s reasoning because:

> [T]here is a fundamental difference between insurers and non-insurers . . . . [as] non-insurers, simply do not have the same specialized experience of providing insurance as an actual insurance company. The reason for imposing a heightened duty to defend on insurers—because they are professional sellers of insurance—is therefore not present in the non-insurance context. There is also a fundamental difference between contracts to sell goods or provide services . . . and contracts for insurance. Unlike insurance contracts, the fundamental purpose of a contract to sell goods or provide services is not to provide for a defense of the purchaser of such goods or services; rather, it is simply to sell goods or provide services, an activity that comes with its own set of obligations, separate and apart from the obligations of an insurer. When it comes to a non-insurer, we find that it would be entirely inappropriate to impose a heightened duty to defend merely because the parties included an indemnification provision in their contract . . . . [W]e conclude . . . that defendant was entitled to go beyond the allegations of the complaint to determine what its obligations were . . . We acknowledge that . . . *McNiff* [is] somewhat in tension with *Ervin.* However, we believe that *Ervin* presents the more well-reasoned approach to this issue and, therefore, we will follow it.

*Id.* ¶ 36. This explanation in support of *Ervin* is persuasive and defensible, especially when compared to the lack of explanation for the standard chosen in *McNiff.* *Cf. Applied Indus. Materials Corp. v. Mallinckrodt, Inc.* ("*Applied Indus. Materials Corp. I*"), 102 F. Supp. 2d 934, 942 (N.D. Ill. 2000) ("*Ervin*'s distinction between the different fundamental purposes underlying each type of agreement is a defensible one.").

Third, the Court notes that the standard in *McNiff* is expressly predicated on an insurer's responsibilities under an insurance policy. In the insurance context, the duty to defend "is determined by comparing the allegations in the underlying complaint to *the relevant provisions of the insurance policy*." *LaGrange Mem'l Hosp.*, 317 Ill. App. 3d at 869, 740 N.E.2d at 26 (2000) (emphasis added). If the allegations in the underlying complaint "fall within, or potentially within, the *policy's coverage*" an insurer's duty to defend arises and the "[r]efusal to defend is unjustifiable unless it is clear from the face

of the underlying complaint that the facts alleged do not fall potentially within the *policy's coverage*." *Baxter Int'l, Inc. v. AXA Versicherung*, No. 11 C 9131, 2014 WL 3583929, at *3 (N.D. Ill. July 18, 2014) (emphasis added); *see also Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 215 Ill. 2d 146, 155, 828 N.E.2d 1092, 1098 (2005) ("If the underlying complaint alleges facts within or potentially within *policy coverage*, *an insurer is obligated* to defend its insured even if the allegations are groundless, false or fraudulent." (emphasis added)). Policy provisions that "exclude or limit coverage must be construed liberally *against the insurer*." *United Nat. Ins. Co. v. Faure Bros. Corp.*, 409 Ill. App. 3d 711, 717, 949 N.E.2d 1185, 1191 (2011) (emphasis added). Accordingly, applying the standard from *McNiff* in a case that does not involve the terms of an insurance policy would contravene the reasoning of the courts in *Ervin* and *Dominick's Finer Foods*.

For these reasons, rather than the being held to the rule that an insurer must defend a suit based on the allegations of a complaint, UMS, as a non-insurer, was permitted to investigate the allegations in the complaint. That said, *Ervin* does not allow a contractual indemnitor to decline a defense "even if it has no information upon which to base a denial." *Applied Indus. Materials Corp. I,* 102 F. Supp. 2d at 944. As the *Ervin* Court explained, the purpose of giving a non-insurer a "greater degree of freedom" to investigate the pleadings is to enable the non-insurer to determine its obligations. *Ervin*, 127 Ill. App. 3d at 990, 469 N.E.2d 243, 250. As such, a party to a contractual indemnity requirement may not "refuse to defend . . . when confronted with allegations in a complaint that could give rise to [liability under the indemnity provision], without actually exercising its right to look behind the bare allegations." *Applied Indus.*

*Materials Corp. I,* 102 F. Supp. 2d at 943–44 (internal quotation marks omitted).

Turning to the merits, the parties' dispute with regard to this claim involves the issue of UMS's breach. To establish breach in this context, the parties must demonstrate that the allegations in Litterer's 2018 complaint, "in any way [arose] out of or [were] relate[d] to the acts or omissions of [UMS], its employees, agents and Subcontractors." *See* Ex. J (Dkt. no 136-2 at ECF p. 54 of 358); *see also FHP Tectonics Corp.*, 2016 IL App (1st) 141650-U, ¶ 84 (limiting its review of whether a non-insurer had a duty to defend under an indemnification agreement to the allegations of the underlying complaint). Where a policy includes "arising out of," only "but for causation, not necessarily proximate causation," will satisfy that language. *Maryland Cas. Co. v. Chicago & N. W. Transp. Co.*, 126 Ill. App. 3d 150, 154, 466 N.E.2d 1091, 1094 (1984) (internal quotation marks omitted); *see also Dominick's Finer Foods*, 2015 IL App (1st) 150369-U, ¶ 51. In other words, "the phrase connotes a causal relationship rather than an incidental or fortuitous confluence of facts." *Atain Specialty Ins. Co. v. Greer*, 182 F. Supp. 3d 873, 877 (S.D. Ill. 2016).

The City argues that it is entitled to summary judgment on this claim because Litterer's 2018 complaint, on its face, alleged enough to put UMS on notice that the allegations in her suit arose out of or were related to UMS's acts or omissions. The City repeatedly asserts that there are no remaining disputes of material fact because UMS has admitted it is responsible for cleaning floors near the TSA checkpoints, the evidence establishes UMS's responsibility for cleaning floors inside the checkpoints, and UMS did not need notice of the spill.

UMS asserts that even if Litterer's 2018 complaint could impose an obligation to

defend, it did not impose that duty because it failed to name UMS or allege that UMS's acts or omissions were the cause of her fall. Though UMS concedes that it is generally responsible for performing maintenance near TSA checkpoints, it contends that it is responsible for cleaning inside checkpoints only when those checkpoints are not operational. When checkpoints are operational, UMS says, its employees may clean inside those areas only when they notice an issue during their rounds, or they have been alerted to an issue by TSA.

The Court agrees with the City that Litterer's 2018 complaint included allegations that would raise the specter of liability under the indemnity provision. Litterer's complaint said that she "slipped and fell in a puddle of liquid on the floor at *or near* the TSA checkpoint at the entrance to Terminal 3." Ex. A (Dkt. no. 136-1 at ECF p. 3 of 405) (emphasis added). The complaint further alleged that the City's failure to exercise ordinary care was because of its "negligent[ ], careless, and improper[ ]" failure to, among other things: "inspect the floors for hazardous conditions at or near the TSA Checkpoint at the entrance to Terminal 3"; "clean and keep dry the floors at or near the TSA Checkpoint at the entrance to Terminal 3"; and "remove the subject liquid from its Terminal 3 area." *Id.*

Though UMS vigorously contests its responsibility to maintain floors within TSA checkpoints during operational hours, it does not contest that it was generally responsible for upkeep near TSA checkpoints. The company's Rule 30(b)(6) deposition witness—Rosen-Sanetra—admitted that UMS was supposed to maintain, inspect, clean, and remove liquid from the floors near checkpoints. Ex. C. (Dkt. no. 136-1 at ECF p. 76 of 405); *see also* Ex. J. (Dkt. no. 136-2 at ECF p. 125 of 358) (stating that

UMS's areas of responsibility in Terminal 3 included "TSA Security Checkpoints (no screening equipment)").  And there is no question that Litterer's accident occurred when the parties' agreement was in effect and UMS was responsible for cleaning spills under the agreement.  *See* Ex. J. (Dkt. no. 136-2 at ECF p. 127 of 358) (under the "Minimum Performance Requirements," the parties agreed that "all areas must be free from dirt, debris, spills, [and] stains"); Ex. C. (Dkt. no. 136-1 at ECF pp. 98–99 of 405).

Construing the facts in favor of the City, because UMS was indisputably responsible for performing maintenance in one area where Litterer alleged she fell in her complaint—near the TSA checkpoint—she effectively alleged that UMS's acts or omissions were the "but for" cause of her injury.  Litterer's complaint alleged that the City failed to exercise ordinary care because it negligently, carelessly, and improperly failed to inspect, clean, keep dry, and remove liquid from the floor at or near the TSA Checkpoint at the entrance to Terminal 3.  *See* Ex. A (Dkt. no. 136-1 at ECF p. 3 of 405).  The parties agree that UMS's responsibilities as the City's contractor included maintaining areas near TSA checkpoints.  Therefore, UMS cannot viably contend that Litterer's complaint did not trigger its duty to defend.  This same conclusion follows even when one construes the facts in favor of UMS, as would be required on the City's summary judgment motion.

Though Litterer's complaint did not mention UMS, it did not need to in order to trigger UMS's duty to defend.[3]  The parties' agreement does not require that UMS be

---

[3] UMS does not cite any cases on this point.  In *FHP Tectonics Corp.*, the court affirmed a grant of summary judgment in part because the defendant "was not named as a defendant in the underlying complaint," "the allegations against [the plaintiff] were for [the plaintiff's own] negligence," and the agreement in that case limited the duty to defend to those "that were 'caused or alleged to be caused' by [the defendant's

named in a complaint alleging an injury or that the complaint expressly allege that UMS's acts or omissions were the cause of an injury. Instead, the agreement states that UMS must defend the City from injuries that "in any way arise out of or relate to the acts or omissions of [UMS], its employees, agents and Subcontractors." Ex. J (Dkt. no 136-2 at ECF p. 54 of 358). As discussed above, that burden was met here.

Of course, the fact that the complaint could trigger liability on the part of UMS does not mean that UMS could not decline to defend the City. UMS was permitted to investigate the allegations in the complaint to determine its contractual obligations to the City. *See Ervin*,127 Ill. App. 3d at 990, 469 N.E.2d at 250. But, when confronted with allegations in a complaint that brought UMS's indemnity obligation into play, UMS could not refuse to defend the City from liability "without actually exercising its right to look behind the bare allegations." *See Applied Indus. Materials Corp. I,* 102 F. Supp. 2d at 943–44 (internal quotation marks omitted).

The City contends that UMS never investigated the allegations in the 2018 complaint and did not respond to the City's tender of its defense. Rosen-Sanetra's deposition testimony supports the City's version of events: she conceded that UMS did not "conduct any investigation, whatsoever," *see* Ex. C. (Dkt. no. 136-1 at ECF p. 70 of 405) and confirmed that UMS never responded to the City's tender letter, *see id.* at ECF p. 53 of 405.

---

actions]." *See FHP Tectonics Corp.*, 2016 IL App (1st) 141650-U, ¶ 85. Here, the agreement is broader; it requires indemnity for matters that "in any way arise out of or relate to the acts or omissions of [UMS], its employees, agents and Subcontractors." *See* Ex. J (Dkt. no 136-2 at ECF p. 54 of 358). Because the basis for liability in this case is broader than the basis for liability considered in *FHP Tectonics Corp.*, the cases are not analogous.

UMS's disagrees and presents several counterarguments. First, UMS contends it "answered the City's allegations by denying that it owed the City a defense and indemnity"—albeit as part of the present litigation. *See* UMS's Resp. to City's Add'l Stat. of Material Facts (Dkt. no. 154 at ECF p. 4 of 6). (citing UMS's answer to the amended crossclaim (Ex. E) and its answers to the City's second Rule 36 requests for admission (Ex. S)). Somewhat confusingly, UMS then argues that it investigated its liability during the discovery phase of this case, UMS Br. 18**,** and that *Ervin* permitted it to wait until it learned the facts of Litterer's case before deciding whether to accept the City's tender, UMS Reply Br. at 6. The Court accepts UMS's assertion that it denied the tender by denying indemnity and defense in its answers. But UMS's assertion that it appropriately investigated its potential obligation to the City does not hold water. If UMS's investigation was co-extensive with the discovery phase of the present lawsuit, as it contends, that would mean UMS's investigation came after when it says it denied the City's tender. There are more than a few problems with this.

The purpose of giving a non-insurer indemnitor a greater degree of freedom than an insurer is so that the non-insurer may investigate the allegations and determine its obligations before refusing to defend, *not after*.[4] The basis for denying a defense should come with the denial. *See Applied Indus. Materials Corp. I,* 102 F. Supp. 2d at 943–44 ("*Ervin* does not authorize a defendant to refuse to defend or indemnify a claim

---

[4] UMS recognizes as much in its own briefs. UMS Br. at 16–17 ("[A] party whose indemnity obligations are incidental to its contract's main purpose can investigate the allegations in a complaint before agreeing to defend in order to 'determin[e] what its contractual obligations to [the indemnitee] in connection with the [ ] suit in fact are.'"); *see* UMS Reply Br. at 6 ("United Maintenance was justified in waiting until it learned the facts of the case before it decided whether to accept the City's tender.").

that the pleadings indicate might give rise to [liability] without having a factual basis for that refusal.").  The Court has not been able to identify any case where a non-insurer indemnitor denied defense and justified its refusal based on an after-the-fact investigation.  In fact, in the cases that apply *Ervin* and discuss the circumstances surrounding the denial of a defense, the non-insurer indemnitor provided justification for refusing defense at the same time it denied defense to the indemnitee. [5]  *See Dominick's Finer Foods, LLC*, 2015 IL App (1st) 150369-U, ¶ 11–15, 16–24 (in which the non-insurer indemnitor asserted the basis for its refusal to defend at the same time it rejected the indemnitee's tender (and retender) for defense in the underlying litigation); *FHP Tectonics Corp*, 2016 IL App (1st) 141650-U, ¶ 13 (in which the indemnitor's insurer explained its justification for denying coverage to the additional insured at the same time it denied coverage); *see also Applied Indus. Materials Corp. v. Mallinckrodt, Inc.* ("*Applied Indus. Materials Corp. II*"), No. 99 C 2518, 2003 WL 1720022, at *2, 2 n.5 (N.D. Ill. Mar. 28, 2003) (explaining that though the non-insurer indemnitor may not have exercised its right to look beyond the complaint, it still "gave reasons" for rejecting the indemnitee's tenders).  Thus, UMS's position has no support in the caselaw.

It is nonetheless worth considering the consequences of UMS's assertion.  If UMS were permitted to deny a defense without justification and then cite an after-the-fact investigation to justify its denial, it would undermine the duty to defend.  Litigation has costs.  The purpose of the indemnity provision here was for the City to avoid having

---

[5] In *Ervin*, the court only tells us that the non-insurer indemnitor (Flagg) "refused to defend," so it is not clear if or when Flagg gave its reasons for denying defense.  *See Ervin*, 127 Ill. App. 3d at 984–987, 469 N.E.2d at 245–247.

to incur costs in suits arising from or related to UMS's work. That is why "parties contract to allocate the expense of defending lawsuits to one or the other." *See Applied Indus. Materials Corp. II*, 2003 WL 1720022, at *6. Though *Ervin* gives a party in UMS's position "a greater degree of freedom" than an insurance company, it does not suggest that non-insurer indemnitors are to be given *carte blanche* at the literal expense of the indemnitee. *See Ervin*, 127 Ill. App. 3d at 990, 469 N.E.2d 243, 250.

Instead, *Ervin* allows a non-insurer indemnitor to refuse to indemnify or defend an indemnitee when it has a "good faith basis to assert that it will not be obligated to defend or indemnify . . . under the indemnity contract." *See Applied Indus. Materials Corp. I*, 102 F. Supp. 2d at 944. That makes sense. If UMS could just deny the City the benefits of the indemnity provision without a justification, "the promise to defend would be, if not worthless, certainly worth much less." *See Applied Indus. Materials Corp. II*, 2003 WL 1720022, at *6. But that is exactly what UMS did. Litterer's complaint arose out or was related to UMS's work at O'Hare, and it was obligated to defend the City. Yet, at the time UMS says it communicated its refusal to defend the City, it provided no basis for its refusal. *See* Ex. E (Dkt no. 136-1 at ECF p. 183 of 405). UMS may not now assert a justification to support its refusal.[6]

---

[6] In both its response and reply briefs, UMS argues that Litterer's accident did not arise out of or relate to its actions or omissions because it did not know and could not have known of the spill that caused her fall. If true, this might be a good defense to liability, but it would not be a basis for refusing to defend the suit, because Litterer's 2018 complaint triggered UMS's duty to defend. *See supra* at 21; *cf. Applied Indus. Materials Corp. II*, 2003 WL 1720022, at *6 (explaining that a complaint's factual inaccuracies could not be the basis for the indemnitor's refusal to defend because the indemnitor's duty was still triggered by the allegations in the complaint). Whether UMS received notice of the spill does not change the fact that Litterer's 2018 allegations arose out of or were related to the acts or omissions of UMS. Moreover, even if UMS could use the lack of notice of the spill as a justification for denying defense, it would still be true that

Second, UMS seemingly contends that even if allegations from the 2018 complaint could impose an obligation to defend, the complaint was deficient because it did not name UMS as a defendant or allege that UMS caused her accident. This argument has already been dispatched. *See supra* at 21–22. The obvious intent of indemnity provision was for the City to avoid having to incur costs in suits arising out of or related to UMS's work at O'Hare. *See* Ex. J (Dkt. no 136-2 at ECF p. 54 of 358). Litterer's 2018 complaint contained allegations that triggered UMS's obligation; it did not need to name UMS in order to do so.

Third, and similarly unavailing, is UMS's assertion that any failure to investigate on its part is somehow excused because it received the tender in January 2019 but did not receive the video of Litterer's fall until February 2020. UMS Br. 18. Again, *Ervin* and like cases permit UMS to investigate the truth of the allegations in the underlying complaint so that it could determine its contractual obligations. *See FHP Tectonics Corp.*, 2016 IL App (1st) 141650-U, ¶ 83. As demonstrated by the discovery, the video was not UMS's sole means of investigating the truth of the complaint's allegations. And though UMS alleges the other parties to Litterer's suit delayed in conducting their own investigations, any delay on the part of others would not excuse UMS's failure to exercise *its* option to investigate before refusing to defend the City.

In sum, whether the facts are taken in favor of the City or in favor of UMS, the evidence clearly demonstrates that UMS refused to defend the City despite the fact that the complaint implicated UMS's duty to defend and before UMS exercised its "right to

---

UMS did not investigate and provide this justification before refusing to defend. Thus, UMS's purported lack of notice of the spill is unavailing.

look behind the bare allegations" of the underlying complaint.  *See Applied Indus.*

*Materials Corp. I,* 102 F. Supp. 2d at 943–44 (internal quotation marks omitted).  In

other words, the evidence establishes UMS's breach of the parties' agreement.

Consequently, the City is entitled to summary judgment as to liability on Count 1, its

claim regarding breach of the duty to defend.  The Court denies UMS's motion for

summary judgment on the same count.

## C.    Damages

There is one final argument to consider, relating to City's duty-to-defend claim.

UMS argues that the City has failed to produce any evidence of resultant damages.

"The basic theory of damages in a breach of contract action requires that a plaintiff

establish an actual loss or measurable damages resulting from the breach in order to

recover."  *In re Illinois Bell Tel. Link-Up II*, 2013 IL App (1st) 113349, ¶ 19 (internal

quotation marks omitted).  The City has submitted redacted paid invoices that it says it

has incurred since the date of its tender to UMS.  *See* Ex. EE (Dkt. no 143).  But those

invoices do not state who was paid or for what.  Without more, they cannot serve to

establish damages that would stem from UMS's alleged breach.  The City also contends

that it may prove it has suffered damages because "claims made and paid for on the

City's insurance policy adversely affect its loss ratio and therefore increases the amount

of the insurance premium the City must pay."  City Reply Br. at 12.  The City has not,

however, provided any evidence to support this hypothetical theory of its damages.

The City has submitted an affidavit that states its own insurance deductible

required it to pay up to $50,000 per claim.  Ex. FF (Dkt. no 149-1 at ECF p. 3–4 out of

4).  The affidavit is signed by Melissa Whalen, the supervising assistant corporation

counsel for the City. *Id.* at ECF p. 3 of 4. Though the City has not produced evidence that, as indicated, establishes the amount it will pay or has paid, neither party disputes that the City's insurer covered Litterer's claim against the City, not UMS's insurer. *See* City Reply Br. at 12; UMS Br. at 2; UMS Reply Br. at 3. Whether viewing this evidence in the light favorable to the City or UMS, the Court can safely infer that the City has paid or will pay a deductible and therefore can establish damages. *Cf. Dominick's Finer Foods*, 2015 IL App (1st) 150369-U, ¶ 49 ("Contrary to defendant's claim, we find that plaintiff sustained damages as a proximate result of defendant's failure to obtain proper insurance.").

UMS argues that Whalen's affidavit must be ignored because she was not disclosed under Federal Rule of Civil Procedure 26(a)(1). Failure to properly identify a witness as required by Rule 26(a)(1) bars a party from using the witness "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). To decide whether an incomplete disclosure is justified or harmless, courts weigh four factors to consider the disclosures impact: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Lopez v. Sheriff of Cook Cty.*, No. 16 C 10931, 2020 WL 1530739, at *11 (N.D. Ill. Mar. 31, 2020) (internal quotation marks omitted), *aff'd*, 993 F.3d 981 (7th Cir. 2021).

The late disclosure here was harmless. The Court finds the first factor most relevant to this analysis. Though the City failed to disclose Whalen, the information was neither a surprise nor prejudicial. The City has consistently alleged that its damages

stem from UMS's alleged breach and among its alleged damages it included "defense costs required to respond to the Complaint." *See* Amd. Crosscl. at 5–6. The future or past payment of the City's insurance deductible is quite obviously one of those costs. Moreover, because the City proffered Whalen's waiver in its response to UMS's summary judgment motion, UMS had the opportunity to respond unlike the plaintiff in *MemberSelect Insurance Co. v. Electrolux Home Products, Inc.*, the case UMS cites for support. *See* No. 13 CV 4097, 2015 WL 6083201, at *3 (N.D. Ill. Oct. 15, 2015). Moving forward, the Court will address with the parties what, if any, discovery UMS needs now that it has Whalen's affidavit.

In sum, determination of the City's potential damages remains an issue to be determined.

### Conclusion

For the reasons stated above, both parties' motions for summary judgment [dkt. nos. 134 and 139] are granted in part and denied in part. The City is entitled to summary judgment as to liability on Count 1, its claim regarding breach of the duty to defend. UMS is entitled to summary judgment as to liability on Count 2, the City's claim regarding breach of the duty to insure. At the telephone status hearing set for June 29, 2021, counsel should be prepared to discuss any further proceedings needed to bring matters on the City's crossclaim to a conclusion.

MATTHEW F. KENNELLY
United States District Judge

Date: June 26, 2021